Welcome to our virtual in-bank courtroom of the Fifth Circuit in New Orleans, with none of us being there. Our second case of the morning is the Fairchilds v. Coryell County et al. We'll hear from Mr. Thomas first. Thank you, your honor. May it please the court, Bruce Thomas representing the appellants, John and Suzy Fairchild, the parents of Kelly Lynn Page. In our brief, we go through five clearly established constitutional violations of excessive force, any one of which should support our right to go to trial on plaintiff's 1983 claims in this case. The initial pepper spray from outside the jail cell door, using pepper spray three more times when the jailers go in, throwing Page to the floor when she is only passively resisting, beating Page when she is subdued on the floor with no means of escape, and finally, holding Page in a prone position with pressure across her upper back until she passes out and dies from being unable to breathe. This morning in my limited time, I'd like to address primarily the fifth incident that led directly to her death. But before I do that, I want to bring the court's attention to the differences between the defendant's present litigation position and their original statements in this case. Let me bring to the court's attention that Lovelady and Pelfrey's original statements are contained in our expert report verbatim at pages five and six of his report. That's tab six of our record excerpts, if you'd like to look at it, which is record on appeals 757 and 758. First of all, how did Lovelady lose his handcuffs? Well, we say he dropped them. But in their briefs, Pelfrey and Lovelady say, well, Page rustled the handcuffs away. Well, what does Lovelady actually say in his original statement? He says, I inadvertently dropped my handcuffs and inmate Page grabbed them and placed them under her. Exactly what we say the video depicts. How did Page come to be on the floor? Well, we say the video depicts that Lovelady threw her to the floor while she was only at most passively resisting. The defendant's litigation position is that, well, she somehow fell to the floor when she was holding the sink and released the sink. Well, in the original statements, again, they agree with us that the takedown was intentional, that he wasn't attempting to handcuff her at the time. Lovelady says, excuse me, Pelfrey says, Corporal Lovelady grabbed her right arm and took her to the ground, causing Page's nose to bleed when she hit the ground. Pelfrey says, I then grabbed her arm and placed her on the floor. So again, nothing about trying to handcuff her and she falls, but placing her on the floor, more accurately throwing her to the floor in a typical judo type move over his leg. So the defendants here are changing their story as the case goes along as litigation was filed, which emphasizes our point that their characterization of events cannot be taken at face value, that unless something is clearly depicted in the video, that their statements have to be viewed with skepticism and their credibility determined by a jury. Also, Lovelady's statement doesn't say anything about going to the jail cell twice. They want to say in their litigation position that they wanted to make the argument that he gave her a warning before he started using force. And our position is he started using force immediately after he went up to the jail cell door, within nine seconds of approaching the door, only two seconds after she shook her head no in response to a command, did he immediately resort to the pepper spray and start using force. So there's nothing in a statement about approaching the door at any other time, but that one time, which we say is what happened. Now, Pelfrey says he approached the door earlier and threatened to put her in a restraint chair, but he doesn't say again, anything about Lovelady approaching the door. So they're changing their story here. Let me turn now to the asphyxiation. They're holding her in a prone position for nearly three minutes. First of all, I'd like to emphasize that this is undertaken against a backdrop of written policies that tell these jailers, don't do exactly what you're doing. Don't use pepper spray to begin with in this situation, and don't keep a prisoner in a prone position for quote, any length of time, specifically in the jail extraction policies. They violate a host of the jail extraction policy, but I only want to concentrate on two this morning, just to that page 863 of the record. First of all, it says, CI says the use of OC and chemical agents may be used to remove an offender from a cell only if the offender is in possession of a weapon, poses a physical threat to officers or other offenders, is behaving in a manner that is creating a serious disturbance in the housing. And then it says this force will not be used against an offender who is merely noisy or shaking, punching, or kicking the cell door, for example. And Paige wasn't even doing that. She was intermittently tapping on the cell door over a course of about 30 minutes. So their own policy contemplates that this is going to happen. Yes, sir. I have a question. You just mentioned a these jailers violated your brief, repeatedly says they violated policies. And I know I understand municipal liability. There was no discovery on that yet. And the district court dismissed the county because there was no underlying constitutional violation, not because of a Manel issue. But I'm just curious, given that you repeatedly say that these individuals violated policies in what you view as the excessive force against your client, how's the county responsible? What's your allegation of how this is attributable to the county if they actually were violating county policies? Quite simple. They were violating the county's written policies. But the written policies, like so many jails across Texas, they don't follow the written policies. They write up very nice written policies. And then the custom is not to follow them and disregard them. So the actual policy in the county was to do what the officers were doing, not to follow the written policies. Do you have allegations of similar episodes in this jail that would have put the county on notice that there was this custom of ignoring policies and using excessive force? Honestly, your honor, I do not recall because the Manel issue wasn't an issue at summary judgment. I just didn't go back and look at that. We generally do. We might have relied upon an obvious theory. I just don't recall. I'm sorry. But let me mention the second policy that specifically warns against positional asphyxia in this circumstance. And of course, this all goes to Darden footnote eight, where this court said in Darden that evidence of violation of policies that they have been warned about or a violation of their training can be evidence of objective unreasonableness. Again, on the same page, 863, little 10 I says as precaution against positional asphyxiation, a restrained offender will not be of OC or OC mixed with chemical agents. And of course, that's exactly what they did here. They left her in a prone position for a considerable length of time, nearly three minutes. I want to ask you, you mentioned that there's a number of points in this episode where you think there was excessive force and you're focusing on the final stage, the pressure applied at the end. You also mentioned the beating. And I've watched the video and it seems pretty clear on the video that love lady punched punched her twice. Did the district court in its love lady opinion address that? I'm trying to see where the court addressed the punching after she was seemingly subdued and the handcuffs have been recovered and all that. No, your honor, I don't think directly did, except for, frankly, indulging all inferences in favor of the defendants. The what the court said was that she was, she was struggling with them, biting them and kicking them. But that's not directly observed in the video. There are fact issues as to whether that was actually occurring. Going back to the credibility issues that I mentioned at the beginning, she's certainly not kicking them. At one point, she slowly pushes her foot against love lady after he has struck her in the face. But that's as close as you can see anything took it. If she was biting, it's just not directly observable. So there are fact issues as to whether that was going on. That's my reason. That's what the court, I believe, should have determined that there were fact issues as to that, that particular issue. Was that was that responsive to your question, judge? Sure. I was just trying to see if the opinion talks about the strikes to the face. I do. I don't recall the opinion specifically addressing that other than generally saying that that she was fighting and struggling with. At mark 832.02, 832 a.m. two seconds after, that's when the jailers turned page over in a prone position for the last time and keep her in that position for nearly three minutes. I would say if it is correct, if the jury determines that it was correct, that in fact, page was biting them while they were trying to recover the handcuffs, then at the very least, everything changed at this point at 832.02, which he has turned in a prone position for the last time. There's no struggling. There's no biting. There's no grabbing at the, anything that could be construed as grabbing at the groin or any such motion from that point forward. She is clearly subdued, clearly restrained within 30 seconds of being put in that prone position. The lady has both handcuffs on her. At that point, at least by that point, at least by that point, everything has changed. Well, the court said in Lytle versus Barrett County and other cases that even if it's an exercise of legitimate, reasonable force at that point, what is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. An officer must reassess the need for force as conditions change. So we cite the Amador case, among others, where five seconds was sufficient time for the officer to readjust, recalibrate, and determine that deadly force was not necessary. These jailers had much more time than that. They were in the process of doing exactly what their policy said they should not do, holding her in a position for a considerable, prone position for a considerable length of time. And with handcuffs on in particularly, there was no reason why they could not at any time turn her on her side. There was no reason that they could not pick her up. A jury can conclude, and I think quite reasonably, that they were simply holding her there until she passed out, until she lost consciousness. That was their intent. But regardless of their intent, that's what they did. You can see her leg dropped for the final time quite swiftly at mark 3410. That's a very good indication that that's probably when she lost consciousness. The jailers, they stay on, they don't turn her over for another 40 seconds after that, and then they're pretty lackadaisical about starting CPR. The court says that they start immediately, again indulging what the defendants say, but that's simply not true. They stand up, and they stand around for a minute or so, looking around, and then in a very lackadaisical fashion, they take the handcuffs off and roll her back over and eventually begin CPR at mark 3605. At that point, she's been unconscious for two minutes, and seconds, of course, are very precious. Mr. Thomas, what do you think is the most factually similar case that you would say clearly establishes this conduct as unconstitutional? I started to say Darden, and then you said it clearly establishes. I understand Darden didn't establish new law, but Darden said the law was clearly established as of the time the events in Darden, and therefore, it's fair game to cite. I don't see how you can deal with our case and not deal with Darden. The facts of Darden are strikingly similar. You have an obese individual who, on the summary judgment evidence, was only passively resisting and then thrown to the ground, just like Paige, an obese individual, passively resisting, thrown to the ground, and then he was struck, and then he was maintained in a prone position until he suffered a heart attack, similar to Paige being maintained in a prone position until she died of physical asphyxia, according to the autopsy report. So, Your Honor, Darden is the most case, and unfortunately, the district court didn't address it, even though we relied upon it heavily in our summary judgment response. The court actually cited a case that we didn't cite at all, which makes me feel like we were a victim of cut and paste. Mr. Thomas, you got three seconds, maybe not the time to start a new thought. I will pick up that thought on rebuttal. Thank you much. All right, then. I think Mr. McGee is scheduled to go next. Yes, Your Honor. May it please the court. My name is Eric McGee, and I represent Stephen Lovelady in this matter, who was a correctional officer at the Coryell County Jail and is one of the affilies in this matter. Also, Mr. Weiland, Cass Weiland, is on, and he represents Wesley Pelfrey, and we also have Eric Johnston, who represents Coryell County. Stephen Lovelady respectfully asks that the court affirm the district court's decision granting his motion for summary judgment based on his entitlement of qualified immunity. First, the court noted that Lovelady was engaged in discretionary duties, including maintaining an appropriate environment in the jail and maintaining appropriate discipline inside a correctional facility. Second, the court determined that Lovelady's actions were well within the objectively reasonable expectation, and they were reasonable, lawful, and necessary considering all the attendant circumstances. To my first point, maintaining the appropriate jail environment and discipline, I think the U.S. Supreme Court has been very clear in the guidance that it's provided to the courts. First, it points out, the Supreme Court points out that a legitimate interest that stem from the government's need to manage the facility in which an individual is detained, that the courts must take that into account. Running a prison is an ordinantly difficult task and a difficult undertaking. Deferring to jail officials concerning the need to preserve internal order and discipline and to maintain the institutional security of the facility. It's also important to note that safety and order at the institution requires the expertise of correctional officials. Tell me how I am to process what you are saying into the specific facts of this case of excessive force. Yes, Judge Jolly. The facts in the case here start off much earlier than the plaintiffs want to direct your, the Fairchild's want to direct your attention to. I think the scope here that they would like to use is narrowing it very limited and using hindsight as 20-20 to piecemeal each interaction with Paige. You actually have to go back to earlier in the morning at 7.48 a.m., which is shown in the record at 3.99, which is the videotape here, at 7.48. That's when Paige begins her action of knocking on the cell door and using the environment inside a jail facility and the appropriate level of discipline to maintain order is you have to take into consideration that on that date, there were only two officers for the entire Coryell County Jail at the facility. And for 45 minutes, they attempted to maintain order over Ms. Paige. I don't disagree with anything that you're saying. What you're saying is quite acceptable to me, generally speaking. Now, the question, the only question I have is after you threw, after she was thrown on the ground, however that happened, I have some question about hitting her in the face and whether that was excessive force under the circumstances that existed. And secondly, is the hold on her neck and exactly what that was, whether it was a choke hold or exactly what sort of hold that was on her neck. And the third thing is the necessity of staying on her back specifically for as long as they did. Now, if you could explain that, what your position is with respect to that, then I can view your case more objectively. I just want to make sure I address all three of your points, Judge Jolly. The first one is if you go back to the record and actually view the specific time stamps, you will see that the strikes are given at three different times. Each strike is responsive to an action of Ms. Paige. Those strikes were not issued before any action on Ms. Paige. The interaction with her is exactly caused by her obtaining the handcuffs, rolling over, she placed herself in the prone position, rolled over on top of the handcuffs and several times attempted to grab the hairbrush that she had also used and threatened an officer with and placed that underneath her. So at that point, two knee strikes were applied to her side in order to gain control of her hands in an attempt to get the handcuffs. They attempted to roll her over on multiple occasions and after they rolled her over the first time, it does show that she bites my client, Mr. Lovelady, on his hand. You see him jerk back. Her foot immediately kicks at his groin and her other hand reaches for his groin. And that's record on appeal 399 at 831-44. At that time when they roll her over, you see for the first time that she attempts to bite Mr. Pelfrey. You see her raise her body up off the ground and her mouth is open in the direction of Mr. Pelfrey. And that's when the first blow from Lovelady was given and it prevented Pelfrey from being bitten. The second time is at 831-55. They are still continuing to attempt to put handcuffs on her and she again attempts to bite Pelfrey. You see her mouth open again and her raising up in an attempt to bite Pelfrey. So that's the reasoning for the strikes were to conclude she was already subdued, then would you agree that it would be unreasonable to strike her in the face? I think the case law has said that if you have a subdued individual, you cannot continue to use force against that person. So your argument is that she wasn't subdued because she was attempting to bite still? And kicking and twisting and grabbing and continue to have control over the handcuffs at this point. And that's very similar to Hill versus Carroll County, Mississippi, where the court in that case described the individual who was in a prone position handcuffed. It's a different situation that was an arrest. And I believe she actually was handcuffed not only with leg restraints, but also wrist restraints. They continued force was used when she continued to kick, twist and otherwise resist the deputies that were trying to effectuate her arrest. And in this case, it's the same situation here. The officers are attempting to gain control over the handcuffs. And in that process, she continues to kick the video clearly it's undisputed kick, bite, twist, she moves her body around and she's the one that attempts to by rolling herself into the prone position. And I think I think it's a complete mischaracterization mischaracterization by Mr. Thomas to say that anyone has changed their stories. No story has changed. The three points he raised were one about the handcuffs. My client didn't say that he lost the handcuffs or he dropped the handcuffs. He said they were knocked out of his whether part of his own struggle, her struggle or someone else's like that. That's not a change in story that goes to his credibility. The same thing was about throwing her to the floor. That's not an inconsistent story. Pelfrey is the one that testified to that. You have to take all the facts into consideration that led up to the reason for why they entered the cell. And when they entered the cell, they had been dealing with a woman for 45 minutes who another independent inmate gave a voluntary statement to DPS. That's a record on appeal 410. And he described the instance. They're saying Mr. Thomas described the instance as tapping on the cell door. The independent witness, the other inmate who gave that voluntary statement said that she was very loud, that the banging was against the door, that it was nerve wracking. I think he said very nerve wracking that once love lady approached and spoke to Kelly that he used a passive voice. Soon as he would leave, she would start the banging again. She was on a mission. She was yelling and she was very persistent. That's an independent witness that gave a voluntary statement there. And it is shown on the record. Judge Jolly, one of his questions is about the pressure applied at the end and the length of maintaining that pressure on her neck. And I was curious about that too, if you could address that. I believe he's referring to defendant Pelfrey. And my view of the incident is watching the record. And I mean, love lady doesn't have a perspective on that because he's in this constant battle here. I see Pelfrey in the record, in that video, shift his weight multiple times in his body. They're all slight movements, but that's not somebody that's using some type of choke hold or staying on her back with all his pressure. You actually see his left hand, I believe, over on a stool holding his body up. And you see his right hand, that's the hand that's supposedly holding her down. If Mr. Thomas's accusation is true, you see his shoulder move a couple of times and his body makes some slight movements like I'm moving now. That's not somebody that's using any type of hold on her. That's just them trying to keep her from, I mean, you can put an arm over someone to prevent somebody to continue to roll over and attempt to bite you. And that's what they were dealing with. Someone who was twisting, kicking, biting, reaching for their groin as they're trying to maintain control of the handcuffs. And if you really look at the video and slow it down, you will see at 8.32.30, I dispute the time of three minutes that she was on the ground. At 8.32.30, you will see, if you stop it right at that particular moment, you will see that's the moment when Paige gets handcuffed and you will see Stephen Lovelady drop his right hand after he handcuffs her to his side. And that's where you see him kind of sit back and catch his breath. And you see him attempting to catch his breath. And then it is just a little over a minute before they immediately start the steps of attempting to gain Mrs. Paige's attention, see if she's responsive, and then they roll her over, take her out of the handcuffs, and they do start CPR immediately. I think that's one of the things, again, I only have about three minutes of where he says we're changing the story, and that's the number of times we're at the door. I just want to draw the court's story. If you actually go back to the video, you will see at 8.02.51, Lovelady appears at the door. They want to ignore all the stuff from 7.48 to 8.29. And that's that 45-minute period of where she bangs six minutes continuously on the door. Lovelady stops by at 8.02.51, and then she takes eight additional minutes. And then Pelfrey appears at the door at that time, stays 10 minutes to calm her down. And I think that's why it's very important when you look at both point one of maintaining discipline and point two, the efforts that they took. You really have to go back to the entire time to review the full video from 7.48 to understand that she's the one causing the disturbance. Both of them, Lovelady and Pelfrey, there are orders for her to stop her misconduct and disturbance, and they are attempting to gain compliance with her only by verbal commands. They attempt to handcuff her when they are outside her cell door. They show a presence of two officers present at her cell door, which is a show of force. Then they use a very small burst of and is seen on video attempting to conceal something at her waist level. There's no compliance like in Darden that they want to use. Darden, for example, Darden's an arrest case, a no-knock warrant case, where the officers arrive and Darden is on the couch with his hands up. Ms. Page at no point is passively resisting. She is aggressively resisting the She hides something over a blanket over her head. She continues to miss and not follow any of the orders or directions of the officers. Then they continue the small burst of pepper spray. She again refuses to obey. In an attempt to turn around and handcuff her, she lets go of the sink and falls to the floor. On the floor, she's not in the prone position. She wasn't slammed down to the floor. The fight continues. And for all of those reasons, the decisions were measured and the limited amount of force was used was appropriate and it only increased in response to Page's actions. That's why we would respectfully request that the court affirm the district court's dismissal based on Lovelady's entitlement to qualified immunity. And I've run out of time and Mr. Weiland has the additional five. All right, Mr. McGee, thank you for your argument. I also thank you for the offered pronunciation of the next council's last name. I had forgotten how to say Cass Weiland's name, but I assume you said it correctly. We'll hear from you, Mr. Weiland. Thank you, Judge Southwick, and may it please the court. I am Stephen Cass Weiland and I represent West Pelfrey. And so I know you've heard many, many excess enforce cases. And you know, and the cases I'll talk about, the facts are critical. The facts are critical in these cases. I want to start by talking about some of the facts that related to Pelfrey that are not in conflict with anything in the record. So it's very important to understand a couple of things. One of them is that Pelfrey was aware that the day before this particular inmate had gotten in a all out fight in her other cell, Pelfrey actually took her to the hospital the day before. So the record reflects that he took her to the hospital. There was no animosity. There was no feeling that Pelfrey is going to try to get retaliation because of something that she had done to Lovelade the day before. These guys entered the cell with no intention of hurting this inmate. So what happened here was Pelfrey spent over 10 minutes trying to patiently, patiently discuss with this inmate what her problem was. And when he would stop and walk away, she would start again. Now, the plaintiffs want to talk about, well, all she was doing was tapping on the steel door. The record reflects that that is not true. She was yelling and screaming and cursing and upsetting the jail equilibrium. So there was a necessity that these guys do something about what was happening on that Sunday morning. And I would suggest to you that if somebody's tapping or banging on a steel door in a jail environment, it is going to reverberate up and down those concrete hallways of that jail and the inmates are going to get upset, the other inmates. So what else did, what else, what other facts apply to Pelfrey? Well, she threatened him. He's trying to reason with her. And the testimony in the record is she told him, uh, if you try to put me in the restraint chair, I'm going to put you in the restraint chair and I'm going to take my hairbrush and jam it in your eye. So that's the kind of person that we're, we're dealing with here. When she persists, they have to restore order. Pelfrey goes into the cell, as was his duty behind his supervisor. Pelfrey didn't throw her down. Pelfrey didn't hit her. Pelfrey didn't get on top of her. And Judge Jolly, I would say that if there were a close, a close look at the video indicates no one ever got on her back. No one ever got on her back. So there's a question about the amount of pressure that Pelfrey supposedly put on her back. Let me talk about that for a moment. It's an immaterial claim by the plaintiffs in this case. It reminds me of the complaint of Judge King in the Mullenix decision to the panel. They're trying to create a fact issue when indeed it's the judge's responsibility to make the decision about unreasonableness. And he did. And he said, really, there's no fourth amendment violation here, because even if Pelfrey put some pressure on there, which is contested, in the context of this fight, it would have been understandable. Because at 831.50 seconds, she tries to bite Pelfrey. You can see it clearly on the tape. And then she tries to bite him again. So a short time later, if his hand is resting on her back, it's an immaterial fact and no reasonable jury would decide the case based on that evidence in the plaintiff's favor. So what the judge did, he could have decided it like in the Aransas County case where the judge just decided the fourth amendment issue would stop. This judge went on and decided the clearly established prong. And there's no case. And he said, the plaintiffs never brought me a case that says that Pelfrey couldn't put his arm on top of the inmate during this fight. So Pelfrey, Pelfrey had... What is the difference, Mr. Wildman, what is the difference between your view of it and that of the plaintiff as to whether he was resting his arm on her shoulders or whether he was put in pressure in some sort of choking manner? Well, I used, I used the term resting judge because you can't tell that the video is not clear that he's putting any pressure on her at all, certainly not on her neck or in a chokehold. The video is absolutely not clear. So they're trying to construct a fact issue to send this to a jury when even that aspect is not clear. But as Judge Albright said, it really doesn't matter. In the context of this case, his reaction was not unreasonable and was not disproportionate. We would, we would urge the court to affirm the dismissal of Pelfrey. I'm out of time. You have some time for rebuttal. You're muted, Mr. Thomas, I think. There we go. Rick Willey works best for me. If you can't tell what's in the video, you can't tell that she was biting and they say it's clear, but no, you can't tell that. It's disputed. These are disputed fact issues for a jury to decide what's going on in the video. The argument, the characterization that they want to make that she's biting, that she's kicking, that she's grabbing at the groin. There are other numerous explanations for every one of her movements, why she might have her mouth open, why she moves her hand this way or that way. They want to characterize it as reaching for his groin. We characterize it as just coming up from being dazed, from being hit in the face. It's a first. Mr. Thomas, let me ask you about one particular fact question. The district court hailed, as the love lady, that he straddled Paige's legs without putting any of his weight on her. Are you saying that the video is ambiguous on that? Was that an inappropriate fact finding or would you agree with that fact finding? As far as the love lady is concerned, he's putting some weight on her butts and on her leg. I would say the video shows that, but not on her back. I would say that that is correct, that the love lady isn't, but I would say that there's a fact question, very big fact question, as to whether Pelfrey is. That's happening right in front of the love lady's face. Go on. Okay. They say Thomas is saying that it was tapping. It's not Thomas that's saying it was tapping. Pelfrey described it as tapping in his deposition. He agreed that it was just tapping. The description here of what Paige was doing is severely overwrought. You don't, we don't have audio, so we only have the jailer's word for whether there was yelling, screaming, and cursing, but from the video, you see no histrionics, histrionics, as if she's engaged in that sort of activity. They want to start at 748. I'm very happy for the court to fact of the matter is, she's not, she's not banging on the door at 748. She looks out the door at 748. She starts tapping on it about 10 minutes later. She never threatened Pelfrey with a hairbrush. That is clear in the video. When Pelfrey throws her to the ground, and that's in the original statements, that's what they say. They said they were under attack by the hairbrush, and that's why Lovelady threw her to the ground, but at the time he threw her to the ground, Paige had her back to Lovelady. She was looking down at the floor. She was at a blanket that she had just pulled up, and she was trying to drape the blanket around her. The characterization that she was trying to hide a weapon, it's just that. It's the jury argument that they want to they took her to the hospital. Was any kind of violence involved in that on her part or anybody else's part? Yes, Lovelady's part. He threw her against the wall, caused her injury, and had to take her to the hospital as a result of that. Okay, and was there evidence of why he responded in that way? Yes, the evidence was that she threw probably some sort of quick cleaning solution out the food slot at him as he was going by. All right, does that figure into any of the evidence that you're relying on of they're trying to make sure that she was completely and totally subdued? Not directly. Indirectly, we think it's supports our position that he had a grudge against her, that he was quick to resort to force in this instance because the previous day she had thrown this liquid on him, but he needs to respond to the circumstances as they exist at the time. There was nothing, it was determined it was nothing dangerous. She, frankly, as we say, she's a mental patient. She needs to be treated. She doesn't need to be beaten. She doesn't need to be threatened with a restraint chair. She doesn't need to be sprayed in the face. As a mental patient, though, does that work in your favor of the requirement of restraint or in their favor in the need for assurance that she would not act irrationally once they released a hold on her? Well, that's a fair point, but I think it works primarily in our favor in that, first of all, they rushed in to the cell. If they should have spent more time trying to communicate with her or to get a nurse down there to talk to her or if they couldn't control her, sent her to a facility that could treat her, not rush in with force against a mental patient. She needed to be used force and more force and greater force into the kill and she shouldn't have died on that. That's my response to her. Mr. Thomas, thank you for that rebuttal and all of you for your presentations today. That ends the cases for this morning. We are in recess. Thank you.